[No. 12007–7–I.   Division One.   June 30, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. PATRICK RALPH SWEET, *Appellant.*

---

*Chris Odell* of *Washington Appellate Defender Association,* for appellant.

*David S. McEachran, Prosecuting Attorney,* and *Mac D. Setter, Deputy,* for respondent.

SWANSON, J.—Patrick Ralph Sweet appeals his convictions for first degree rape, first degree burglary, and two counts of unlawful possession of a firearm. On January 9, 1984, this court affirmed Sweet's convictions. *State v. Sweet,* 36 Wn. App. 377, 675 P.2d 1236 (1984). Sweet's petition for discretionary review was granted by the Supreme Court, which remanded the case to this court for "reconsideration in light of" *State v. Smith,* 102 Wn.2d 449, 688 P.2d 146 (1984) and *State v. Williams,* 102 Wn.2d 733, 689 P.2d 1065 (1984). We therefore address only those issues raised by these decisions, namely, whether Sweet's initial detention constituted a valid *Terry* investigative stop and whether police subsequently exceeded the proper scope of that detention when they frisked Sweet, interrogated him briefly in a patrol car, and then transported him to a nearby, apparently unrelated, crime scene. Once again, we affirm Sweet's convictions.

The underlying facts were set forth in this court's original opinion and will be supplemented only as necessary:

At 9:15 p.m. on April 16, 1982, Lynden Police Officers Oppewall and Clark received a call concerning a suspicious 1969 Dodge pickup truck. About 11:20 p.m., they found it parked and unoccupied in front of a closed business in a mixed business and residential neighborhood. After checking it they saw a man standing in the shadows with his back against a building about three-fourths of a block away.

The officers drove toward the man who immediately fled at a full run with Officer Oppewall yelling "Halt! Police!". The man continued to run but was apprehended soon thereafter. Upon being caught, the man, wearing cotton work gloves and with a nylon stocking sticking out of a pocket of his brown leather jacket, dropped a red ski mask. When he was frisked for weapons, a blue watch cap, a flashlight and a folding knife were found. He identified himself as Patrick Sweet.

Suspecting Sweet of criminal activity and not wanting him to flee again, Officer Oppewall ordered Sweet into the patrol car. Sweet complied. Oppewall then informed Sweet of his *Miranda* rights, which Sweet acknowledged, and then asked, "What's going on?" Sweet replied that

he was a "pointman," that two other people were involved, that he was just the lookout, and that he ran from the officers because he was scared. Questioning of Sweet was interrupted by a police radio broadcast of a hostage situation one block away.

According to the broadcast, a young girl was being held hostage by her father in his estranged wife's home. The officers took Sweet, handcuffed,[1] with them to the new crime scene where they focused their attention exclusively on the hostage situation. After a short time, a 13–year–old girl emerged from the house and told the officers that an intruder (not her father) clad in a brown leather jacket and wearing a red ski mask had broken into her house and raped her. The officers immediately realized that the description matched Sweet and returned to the car to place him under arrest.

When the officers reached Sweet he appeared unconscious. Because of his condition, Sweet was taken to a nearby hospital where he was treated for approximately 30 minutes and then released in apparent good health. Sweet was then taken to jail and questioned about the rape.

Meanwhile, Sweet's truck (the suspicious Dodge pick–up) was impounded. During an inventory of the vehicle, an automatic handgun was found.

*State v. Sweet, supra* at 379–80.

### INITIAL INVESTIGATORY DETENTION

In *State v. Williams,* 102 Wn.2d 733, 739, 689 P.2d 1065 (1984), our Supreme Court set forth the following 2–part inquiry governing investigatory stops:

First, was the initial interference with the suspect's freedom of movement justified at its inception? Second, was it reasonably related *in scope* to the circumstances which justified the interference in the first place?

■ Police, lacking probable cause, may briefly detain and question a person if they have "a well founded suspicion based on objective facts that he is connected to actual or potential criminal activity." *State v. Sieler,* 95 Wn.2d 43,

---

[1]The testimony at the suppression hearing indicates that Sweet was locked in the back of the patrol car at this time but was not handcuffed until he was arrested.

46, 621 P.2d 1272 (1980); *see also State v. Thompson,* 93 Wn.2d 838, 841, 613 P.2d 525 (1980); *Terry v. Ohio,* 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

■ In order to determine whether Sweet's initial detention was proper, we must first ascertain at what point during the continuum of events Sweet was seized. A seizure for purposes of the Fourth Amendment occurs

> when the individual's freedom of movement is restrained by a show of force or authority, such that "in view of all of the circumstances . . . a reasonable person would have believed that he was not free to leave."

*State v. Friederick,* 34 Wn. App. 537, 541, 663 P.2d 122 (1983) (quoting *State v. Stroud,* 30 Wn. App. 392, 395, 634 P.2d 316 (1981)). Because a reasonable person does not flee an officer's order to stop, we conclude that Sweet was "seized" no earlier than when the officer called out, "Halt! Police!" after he had started to flee. *See State v. Friederick, supra* (officer's statement of "Stop. I want to talk to you," to suspect who then fled resulted in seizure); *cf. State v. Stroud, supra* at 396 (passenger in car "seized" for Fourth Amendment purposes when officers pulled up behind parked vehicle and switched on the flashing light).

When Officers Oppewall and Clark first spotted Sweet, they could properly consider the following circumstances: the person was flattened up against a building in an area of light foot or vehicle traffic and was standing 2 to 3 feet away from a pile of horse manure; it was 11:20 p.m. on a Friday night and the area was dark and somewhat isolated; the person was near a pickup truck that had earlier been reported as "suspicious"; the pickup was parked close to the office of the Price Brothers Chevron bulk dealer plant; the bulk plant and a nearby nursery were closed; no other persons or vehicles were in the immediate area. We need not decide whether such circumstances alone would justify an investigatory detention, because as the officers turned their car toward Sweet, he fled.

■ Courts have generally regarded flight in the presence of police officers to be a circumstance that may be consid-

ered along with other factors in determining whether an investigatory stop is justified. *See State v. Swaite,* 33 Wn. App. 477, 481, 656 P.2d 520 (1982) (fact that person matching description of possible burglary suspect, upon seeing police officer, jumped into bushes justified investigatory detention); *see also United States ex rel. Richardson v. Rundle,* 461 F.2d 860 (3d Cir. 1972) (fact that four men observed running from possible robbery then attempted to elude plainly marked police car a factor to be considered in justifying investigative stop); *United States v. Lee,* 372 F. Supp. 591 (W.D. Pa. 1974); 3 W. LaFave, *Search and Seizure* § 9.3(c), at 74 (1978). On the basis of the surrounding circumstances, including the fact that Sweet fled after seeing the police approach, and reasonable inferences drawn therefrom, Officers Oppewall and Clark had specific and articulable facts upon which to base a reasonable suspicion that criminal activity, possibly a burglary in a nearby building, was afoot. Sweet's initial seizure was therefore reasonable.[2]

### SCOPE OF INVESTIGATORY DETENTION

■ Having determined that Sweet's initial detention

---

[2]Sweet contends that evidence of his flight may not be considered for purposes of justifying the investigatory detention because police had already decided to question Sweet before he fled. We find this argument to be without merit, for it would mean, in effect, that Sweet was "seized" as the officers turned their car in his direction. Not every public encounter between a police officer and a citizen constitutes a "seizure." Police may approach individuals on the street and engage them in conversation or ask them if they are willing to answer questions without an investigatory detention. *See State v. Aranguren,* 42 Wn. App. 452, 455, 711 P.2d 1096 (1985); *State v. Belanger,* 36 Wn. App. 818, 820, 677 P.2d 781 (1984); *see also Florida v. Royer,* 460 U.S. 491, 497, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). As the Court in *Terry* noted,

> Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Terry,* at 19 n.16; *see also Florida v. Rodriguez,* 469 U.S. 1, 83 L. Ed. 2d 165, 105 S. Ct. 308, 310 (1984); *United States v. Mendenhall,* 446 U.S. 544, 554, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980); *see generally* 3 W. LaFave, *Search and Seizure* § 9.2(g) (1978). Thus, even if Sweet had not fled, no seizure would have occurred merely because officers had decided to approach him.

was reasonable, we turn to the issue of whether police subsequently exceeded the scope of a valid investigatory detention. The permissible scope of a valid *Terry* stop depends on the specific circumstances of each case.

> This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Florida v. Royer,* 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). Three factors must be considered in determining the proper scope of an investigatory detention: "the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained." *Williams,* at 740. Article 1, section 7 of the Washington Constitution mandates that police actions exceeding the scope of a *Terry* stop are justifiable only by the existence of probable cause to arrest. *See Williams,* at 741.

In *Williams,* police stopped the defendant as he was driving away from the scene of a silent burglar alarm. Williams was ordered out of the car, frisked, handcuffed, and placed in the backseat of the patrol car. Police did not question Williams about his presence in the area until after they had investigated the house and called for a canine unit. In the instant case, unlike *Williams,* the purpose of the stop was directly related to Sweet's detention. After he was frisked, Sweet was placed in the police car and questioned about his suspicious behavior. Sweet's response, given after he was advised of his *Miranda* rights, was that he was a "pointman", a "lookout" for two other persons. This answer could only reinforce, not dispel, the officers' suspicion of criminal activity. At this point, the questioning was interrupted by the radio report of an apparently unrelated hostage situation on Maple Street, approximately one block from where the officers were questioning Sweet. No further questioning took place as Officers Oppewall and

Clark responded to the radio call. Continued detention while the officers responded to this potential emergency situation was reasonable and justified within the scope of the original detention.[3]

    ■ Second, the amount of intrusion in the instant case, while significant, was within the proper scope of an investigatory detention. Sweet was frisked and then placed in the patrol car for further questioning. The decision to question Sweet in the patrol car was clearly reasonable in light of Sweet's already demonstrated propensity for flight. *See State v. Taras,* 19 Ariz. App. 7, 504 P.2d 548 (1972) (handcuffing and seatbelting suspect in rear of patrol car reasonable and within scope of investigatory detention when suspect had fled in vehicle at approach of police, ignored shouts to halt, and abandoned moving vehicle, even though initial police investigation revealed car not stolen).

    ■ We also conclude that the frisk was proper under the circumstances. A valid investigatory detention does not automatically justify a subsequent frisk. A limited patdown for weapons is justified, however, when an officer reasonably believes that the individual detained may be armed and dangerous. *Terry,* at 24. "The officer need not be absolutely certain that the individual is armed; the issue is

---

[3]Relying on *State v. Holeman,* 103 Wn.2d 426, 693 P.2d 89 (1985), Sweet contends he was arrested at the point officers physically detained him in the police car. *Holeman,* however, did not involve an investigatory detention and is inapposite in the instant case. Sweet's continued physical detention does not transform an otherwise valid investigatory stop into an arrest, requiring probable cause. As courts have repeatedly stressed, arrest analysis involving a restriction on a suspect's movement "is not helpful in the investigative stop context." *State v. Gardner,* 28 Wn. App. 721, 725, 626 P.2d 56 (1981); *see also State v. Samsel,* 39 Wn. App. 564, 569, 694 P.2d 670 (1985); *State v. Wakeley,* 29 Wn. App. 238, 240, 628 P.2d 835 (1981); *State v. Champion,* 28 Wn. App. 281, 285–86, 622 P.2d 905 (1981). As LaFave observes:

> A stopping for investigation is not a lesser intrusion, as compared to arrest, because the restriction on movement is incomplete, but rather because it is brief when compared with arrest, which (as emphasized in *Terry*) "is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows."

3 W. LaFave, *Search and Seizure* § 9.2, at 30.

whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* at 27. The suspicion of dangerousness must focus directly on the person to be frisked, not merely on the area in which the person is found. *Ybarra v. Illinois,* 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979) (narrow scope of *Terry* exception does not permit frisk merely because person happens to be on premises of otherwise authorized narcotics search). The officer's belief is not reasonable unless he or she can point to "particular facts" from which a reasonable inference of dangerousness may be drawn. *Sibron v. New York,* 392 U.S. 40, 64, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968). A "generalized suspicion" is insufficient to justify a frisk. *State v. Smith,* 102 Wn.2d 449, 453, 688 P.2d 146 (1984) (fact that officers routinely frisked people questioned in high crime area does not by itself justify frisk).

In *State v. Williams,* 102 Wn.2d 733, 689 P.2d 1065 (1984) police could not articulate any reasons for believing the defendant to be dangerous. He had made no "furtive gestures or violent responses"; nor did the suspected crime of burglary, by itself, support an inference of dangerousness. *Williams,* at 740. In *State v. Wade,* 390 So. 2d 1309 (La. 1980), *cert. denied,* 451 U.S. 989, 68 L. Ed. 2d 848, 101 S. Ct. 2326 (1981), the Louisiana Supreme Court confronted facts similar to those in the instant case. In *Wade,* police officers patrolling a high crime area in an unmarked police car observed the defendant walking "in a hurried manner." When the defendant observed the car approaching, he fled. At this point the officers decided to question the defendant and gave chase. After catching and detaining the suspect, police frisked him. In upholding the validity of the search, which had produced a weapon, the court applied the following analysis:

> The frisk of the defendant was supported by reasonable cause. The officers knew they were riding in a high crime area where violent crimes were numerous. They observed the defendant walking nervously. This alone

would not lead a reasonable person to believe that the defendant was armed. But when the defendant appeared to "make" the officers as policemen and began to flee, the very same action which gave the officers reasonable cause to make the investigatory stop also appeared to indicate that the defendant was worried about apprehension for more than just a minor crime. The presence of a weapon on the defendant was certainly something the officers could rightly fear when they halted his flight by "cornering" him and identifying themselves as police officers. Further, the defendant was wearing a leather jacket, thereby rendering a visual search for a suspicious "bulge" in his clothing inadequate to insure their safety.

*State v. Wade, supra* at 1313.

The facts in the instant case are even more supportive of the officers' actions. Sweet was first observed in a somewhat isolated area at night; nearby businesses were closed. Sweet fled at the approach of the officers and ignored shouted requests to stop. Officer Clark testified that when he finally caught up to Sweet and ordered him to freeze, Sweet's first response was to start to turn. Clark then ordered Sweet to raise his hands and move forward to a wall. As Sweet placed his hands against the wall, the officers observed him drop a red ski mask. They also noticed that Sweet was wearing dark work gloves and a brown leather jacket. A ski mask and gloves are items reasonably associated, in the circumstances of this case, with burglary and crimes of violence. In light of all the surrounding circumstances, including the articles of clothing and Sweet's movements and gestures in response to the officers' presence, as well as the reasonable inferences to be drawn therefrom, we find that the officers had a reasonable and articulable suspicion that Sweet might be armed and dangerous. *See State v. Smith, supra* at 452. A brief patdown for protection of the officers was therefore justified and the knife and flashlight were properly admitted.

Finally, the detention in the instant case was relatively brief. In *Williams,* the court observed that the approximately 35–minute detention "approach[ed] excessiveness."

*Williams,* at 741. Although the record before us is not completely clear, no more than 10 to 20 minutes elapsed between the time the officers received the hostage report and the moment officers determined the unresponsive Sweet to be under arrest for rape and burglary.

In summary, we find that the initial investigatory stop, based on police observation of Sweet and his subsequent flight, was proper. Once Sweet was physically detained, the weapons patdown was also justified. Finally, at the time police received the report of a hostage incident, continued detention, in light of the circumstances surrounding the initial observation, Sweet's flight, the articles of clothing, and, in particular, Sweet's response that he was a "pointman", was proper and within the scope of a valid investigatory detention.

In his supplemental brief, Sweet has again contested the validity of the impoundment of his truck and the subsequent inventory search, issues only tangentially addressed in *Williams.* We affirm this court's original analysis upholding both the impoundment and subsequent inventory search. *See Sweet,* at 382–83.

Impoundment as part of the police "community caretaking function" is proper if the vehicle is threatened by theft of its contents and neither the defendant nor acquaintances are available to move the vehicle. *State v. Williams, supra* at 743 (quoting *State v. Simpson,* 95 Wn.2d 170, 189, 622 P.2d 1199 (1980)). In the instant case, officers were unable to arouse Sweet either to have him sign a waiver of liability or to give alternative instructions for disposition of the vehicle. Officers were able to look through the windows of the truck canopy and observe numerous items of potential value, including tools, in the truck bed. Consequently, even if officers had locked the canopy, the potential for theft remained. *Cf. State v. Houser,* 95 Wn.2d 143, 155–56, 622 P.2d 1218 (1980) (property in locked trunk presents no great danger of theft because potential thief would be unaware of contents). Finally, Sweet had been charged with two felonies and would be unable to return

for the vehicle in the near future. The impoundment was therefore proper.

The scope of the inventory search in the instant case was also proper. No evidence suggests that the inventory was not conducted in good faith or that it was a mere pretext for an investigatory search. *See State v. Simpson, supra* at 189; *State v. Houser, supra* at 155; *see also South Dakota v. Opperman,* 428 U.S. 364, 376, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976). The gun found during the search was in plain view, lying on top of a paper bag. As already indicated, Sweet was unresponsive during this period and unable to accept or reject the protection underlying the inventory search. *See State v. Williams, supra.*

In summary, the search and seizure were valid and the evidence properly admitted at trial. The judgment of the trial court is affirmed.

RINGOLD, A.C.J., and WEBSTER, J., concur.

Review denied by Supreme Court October 7, 1986.